******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* RICHARD DORE
## (AC 47243)

Cradle, C. J., and Alvord and Seeley, Js.

*Syllabus*

Convicted, after a trial to the court, of possession of child pornography in the second degree in violation of statute ((Rev. to 2015) § 53a-196e (a) (2)), the defendant appealed. The defendant had been charged after the police, pursuant to a search warrant, seized one of his home computers, which contained pornographic images of minor children that he had downloaded from the Internet. The defendant claimed, inter alia, that subdivision (2) of § 53a-196e (a) violated the first amendment to the United States constitution because it was overbroad in that its breadth or scope was not limited to pornography involving real children. *Held*:

There was no merit to the defendant's claim that subdivision (2) of § 53a-196e (a) was unconstitutionally overbroad because it does not include the term child pornography, as subdivision (2) must be read in conjunction with subdivision (1) of subsection (a), which expressly uses the term child pornography, the statutory ((Rev. to 2015) § 53a-193 (13)) definition of which limits the images proscribed under subdivision (2) to those of real children and excludes from its ambit virtual child pornography.

This court rejected the defendant's claim that § 53a-196e (a) (2) was unconstitutionally vague on its face for the same reasons it rejected his claim that § 53a-196e (a) (2) was overbroad, and the defendant's contention that subsection (a) (2) was vague as applied to his conduct also lacked merit, as subsection (a) (2) provided sufficient notice that it proscribed the possession of child pornography and provided sufficient guidance as to what the state must prove to obtain a conviction, and the defendant's conduct clearly fell within the statute's unmistakable core meaning of prohibited conduct, namely, the possession of pornographic material depicting persons younger than sixteen years of age.

The defendant could not prevail on his claim that the evidence was insufficient to support his conviction insofar as it did not establish that the images seized from his computer were those of real children younger than sixteen years of age, as the trial court reasonably could have found that the images depicted real children on the basis of the defendant's statements to the police, the file names under which he downloaded the images and the testimony of witnesses, including that of a pediatrician, as well as the court's own viewing of the images.

Moreover, contrary to the defendant's claim, there is no requirement that the state present expert testimony to establish that the particular images depict real children, as the language of § 53a-193 (13) provides that the issue of whether the subject of a visual depiction was a person younger than sixteen years of age at the time the visual depiction was created was a question to be decided by the trier of fact, and the record was devoid of evidence

concerning technology existing at the time the defendant downloaded the child pornography or a trier of fact's ability to distinguish realistic images of virtual children from images of real children.

Contrary to the defendant's assertion that the evidence was insufficient to establish that he knowingly possessed child pornography because his computer lacked the capability of playing the video files he had partially downloaded, the trial court reasonably could have concluded, on the basis of the direct and circumstantial evidence in the record and the reasonable inferences drawn therefrom, that the defendant was the only person with access to his password protected computer and, thus, that he had control of the computer and possession of its contents.

Argued October 6, 2025—officially released February 10, 2026

*Procedural History*

Substitute information charging the defendant with five counts of the crime of possession of child pornography in the second degree, brought to the Superior Court in the judicial district of Ansonia-Milford and tried to the court, *Hall, J.*; thereafter, the court denied the defendant's motion for a judgment of acquittal; finding and judgment of guilty, from which the defendant appealed to this court; subsequently, the court, *Hon. H. Gordon Hall*, judge trial referee, issued an articulation of its decision. *Affirmed*.

*E. Gregory Cerritelli*, with whom, on the brief, was *P. Jo Anne Burgh*, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Margaret E. Kelley*, state's attorney, and *Matthew R. Kalthoff*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SEELEY, J. The defendant, Richard Dore, appeals from the judgment of conviction, rendered following a court trial, of five counts of the crime of possession of child pornography in the second degree in violation of General Statutes (Rev. to 2015) § 53a-196e (a) (2).[1]

___

[1] General Statutes (Rev. to 2015) § 53a-196e (a) provides: "A person is guilty of possessing child pornography in the second degree when such person knowingly possesses (1) twenty or more but fewer than fifty visual

On appeal, the defendant claims that **(1)** § 53a-196e **(a) (2)** violates the first amendment to the United States constitution because it is **(a)** overbroad and **(b)** vague, and **(2)** the evidence was insufficient to establish that **(a)** the child pornography he was found to have possessed depicted real children and **(b)** he knowingly possessed child pornography. We disagree with the defendant's claims and affirm the judgment of the court.

The following facts, which were found by the trial court or are otherwise undisputed in the record, and procedural history are relevant to our review of the defendant's claims. The defendant was arrested and charged in a second amended long form information (operative information) with five counts of possession of child pornography in the second degree in violation of § 53a-196e **(a) (2)** following a search of his residence conducted pursuant to a warrant. The facts underlying the basis for the search and the charges were set forth by the court in its decision filed September 21, 2023: "[I]n [January] 2016, Detective David Aresco of the Connecticut State Police Computer Crimes Unit downloaded a partial video file that contained apparent child pornography from a user accessing a peer-to-peer network[2] with the eMule program.[3] . . . The user reported the eMule

depictions of child pornography, or (2) a series of images in electronic, digital or other format, which is intended to be displayed continuously, consisting of twenty or more frames, or a film or videotape, consisting of twenty or more frames, that depicts a single act of sexually explicit conduct by one child."

In this opinion, references to § 53a-196e (a) (2) are to the 2015 revision of the statute, unless otherwise indicated. We also note that the statute was amended in 2024 to replace the term "child pornography" with the phrase "child sexual abuse material." See Public Acts 2024, No. 24-118, § 5.

[2] At trial, Carmelo J. Rizza, a forensic examiner with the state forensic science laboratory, testified that peer-to-peer "is a program where users are sharing and downloading data from each other." On a peer-to-peer network, the files that are shared come from "[t]he users themselves." An example of a peer-to-peer network is the eMule program. See footnote 3 of this opinion.

[3] The eMule program is a computer program in which users share data and download it from each other. The eMule program must be downloaded

user name 'newone' and had an IP address[4] within the state of Connecticut.[5] . . . On May 16, 2016, members of the Connecticut State Police—including . . . Aresco and Detective Daryll Christensen—participated in the execution of a search warrant at [the property associated with that IP address] 23 Emerald Ridge Court in Shelton.[6] . . . The defendant and his wife were the only residents of the home at that address. . . . In an interview with . . . Aresco, the defendant identified four computer devices that he used,[7] including a computer server in the basement. . . . The defendant provided a password that he used for each device. . . . Prior to seizing the Gateway computer server from the basement . . . Aresco previewed the device and observed the eMule program running with dozens of active downloads showing in a 'transfers' queue. . . . Many of the downloads had visible file names

from the Internet and installed on a computer. It is the program used for the eDonkey network, which is a peer-to-peer file sharing network.

[4] Aresco testified at trial that an "IP address" is an "Internet protocol address," which is "similar to a telephone number . . . it's how information gets transmitted through the Internet. It's unique to a particular computer signed on to the Internet."

[5] At trial, Aresco testified that, when he was notified on January 21, 2016, regarding possible child pornography on a computer, he determined that the computer was using the eMule program, and, from that, he was "able to determine the file that was being shared and the IP address from which it was being shared. [He] was also able to determine the version of the eMule program that was running and also a name that was assigned to the eMule program," which was "newone." He explained that the name "newone" was user specific, and that he successfully downloaded and viewed part of a video file from the eMule user "newone." Aresco explained further that the video file that he had downloaded was approximately thirteen minutes and fifty seconds in length in its entirety. He was able to download approximately fifty-three seconds of the video. He testified that the portion that he downloaded depicted "a child that was less than one year old. The child was in a supine position, the child's legs were spread apart, the camera was focused on the child's genitalia. I do recall that there was what appeared to be an adult male's hand rubbing the child's genitalia, and I think towards the end of the video an adult male performed oral sex on the child's genitalia."

[6] Christensen, a former detective with the state police, testified at trial that, in his job as a state police detective, his primary role was in the computer crime laboratory. He testified at trial concerning the chain of custody of the evidence seized from the defendant's residence.

[7] All four computer devices were admitted into evidence.

that contained terms associated with child pornography. . . . The defendant signed a receipt for the items seized from his residence. . . .

"Christensen transported the items seized from the defendant's residence, including the Gateway computer server. . . . On July 28, 2016, the items were delivered to the evidence receiving section at the [state] forensic science laboratory. . . . Forensic Examiner Carmelo [J.] Rizza conducted a forensic examination of the Gateway computer with serial number GCX7121004306. . . . He was tasked with searching the computer for image or video files suspected to contain child pornography, as well as peer-to-peer data. . . . To conduct the search . . . Rizza utilized a forensic process and forensic software. . . . Rizza memorialized his findings in a report. . . . Rizza reported that he located more than 250 files of suspected child pornography on a one terabyte hard drive that was removed from the Gateway computer and analyzed. . . . Some of the files suspected to contain child pornography—including files with the names 207.part, 230.part and 311.part—were located within a directory with the partial path of Shared-D/Overnet/Intermediate.[8] . . . Data obtained from the eMule program on the Gateway computer indicated that incoming downloads would have been written to the Shared-D/Overnet folder once complete and Shared-D/Overnet/Intermediate while still in

---

[8] Specifically, Rizza testified that the files with the names 207.part, 230.part and 311.part were contained within the Gateway computer. He identified the files as movie files and explained the location where the files could be found within the computer. For example, for file 207.part, "you would open up Windows Explorer . . . go to the C drive, go to the folder Shared D, go to the folder Overnet, go to the folder Intermediate, and then access the file 207.part." He explained further that "[t]he Shared D, based on [his] experience, [was] a user generated [folder]," whereas "[t]he Overnet and Intermediate . . . [were] generated from a software." Through his forensic examination of the Gateway computer, Rizza determined that the three files—207.part, 230.part and 311.part—each had been written to the hard drive of the Gateway computer and that a user would have access to those files. He did not find any type of media player within the Gateway computer.

progress.[9] . . . The user name for the eMule program on the Gateway computer was 'newone.' . . . Rizza located terms that had been entered into the eMule program's search feature, including '2015 pthc,'[10] '12 yo,' and 'lolitasex.' . . . The defendant's name, Richard, was listed as a user of the computer." (Citations omitted; footnotes added.)

The defendant was arrested and charged with five counts of possession of child pornography in the second degree. Each count charged the defendant with possession of child pornography on May 16, 2016, and pertained to a video clip taken from the files with the names 207.part, 230.part and 311.part. Specifically, count one charged that the defendant "did knowingly possess a moving picture of more than twenty frames on a Gateway computer—to wit, file '207.part' from 00:00 through 00:31—which depicted one child engaged in sexual intercourse, in violation of [§] 53a-196e (a) (2)"; count two charged that the defendant "did knowingly possess a moving picture of more than twenty frames on a Gateway computer—to wit, file '207.part' from 13:48 through 15:00—which depicted one child engaged in masturbation, in violation of [§] 53a-196e (a) (2)"; count three charged that the defendant "did knowingly possess a moving picture of more than twenty frames on a Gateway computer—to wit, file '207.part' from 32:57 through 33:33—which depicted one child engaged in sexual intercourse, in violation of [§] 53a-196e (a) (2)"; count four charged that the defendant "did knowingly possess a moving picture of more than twenty frames on

[9] When Rizza was questioned at trial regarding the properties and sharing attributes of the Shared D folder, he testified that they indicated that the Shared D folder was being shared on a local network. When asked how the Shared D folder could have been found on another computer on that local network, he explained: "If another computer was connected to the local network, they would be able to access it through the network program within the PC, and then access web server, and then access the D drive as it's labeled here [in state's exhibit 17]."

[10] Aresco testified at trial that "pthc" is a "popular" search term that "individuals use to find files of child pornography" and is short for "preteen hard core."

a Gateway computer—to wit, file '230.part' from 37:00 through 40:10—which depicted one child engaged in masturbation, in violation of [§] 53a-196e (a) (2)"; and count five charged that the defendant "did knowingly possess a moving picture of more than twenty frames on a Gateway computer—to wit, file '311.part' from 02:55 through 04:29—which depicted one child engaged in sexual intercourse, in violation of [§] 53a-196e (a) (2) . . . ." The defendant pleaded not guilty to the charges and, on April 26, 2023, waived his right to a jury trial and elected to be tried to the court. The court found the defendant's waiver to be knowing, intelligent, and voluntary.

At trial, Aresco, who also examined the Gateway computer, testified for the state. Specifically, he testified that, as a member of the state police computer crimes unit, he "primarily investigate[s] sexual exploitation crimes with children," for which he has received specialized training. One way in which he investigates such crimes is through peer-to-peer file sharing networks, such as the eDonkey network, for which he also has received training. In his testimony, he explained that "[e]Mule is the program that's used for the eDonkey network," which "is the actual file sharing network." He explained further that a person interested in sharing or downloading child pornography would use a peer-to-peer program like eMule[11] because "[t]he files are easy to find, and they download quickly," and users can download files from other users and share their files with other users as well. Aresco testified further that, during the course of his investigative work, he had become familiar with certain terminology or search terms used by individuals to find files of child pornography. Such terms include "pthc, which is short for preteen hard core," as well as

---

[11] Aresco testified that, when the eMule program is installed on a computer, it creates an "eMule folder and [a] downloads folder. And then, within that eMule folder are two additional folders, one is labeled Temp, and the other is labeled Incoming. . . . Incoming are files that are completely . . . downloaded and being shared to the network," whereas temporary files are "[f]iles that are in the process of being downloaded."

"preteen, pedo, lolia, mafia sex [and] volia . . . ."[12] He also has "seen individuals use a number followed by y.o. for years old. So, you may see 1yo, 2yo, all the way up to whatever age they're looking for." A user of eMule can be identified by their IP address.

Aresco also testified regarding the circumstances of his investigation of the defendant and the search of the defendant's residence, including his discussion with the defendant prior to the search. Specifically, Aresco testified that, in addition to the defendant providing Aresco with the passwords to his computers, the defendant told Aresco that "he used the eMule program to download movies, software, software materials, and pornography." When asked specifically about the pornography, the defendant told Aresco that he had "downloaded illegal pornography," which the defendant described as pornography involving individuals under eighteen years of age. Aresco testified that, after he had informed the defendant that, in Connecticut, "child pornography is defined as pornography involving individuals under the age of sixteen," the defendant told him that "he had downloaded pornography involving individuals under the age of sixteen." Aresco also told the defendant that the police would "have the ability to forensically see the search terms that [the defendant] entered to find files." After he explained that if, for example, the defendant used the term "teen," that could include both adult and child pornography, Aresco was about to describe the search term preteen, but before he could say the word preteen, "the defendant used that term himself."

During his testimony, Aresco stated that there were devices in the defendant's residence that had not been seized by the police during the search, including a network attached storage device called an NAS drive, along with another external hard drive, and he explained how he connected an external hard drive, which contained a copy of the Shared D folder from the defendant's computer,

---

[12] Rizza testified similarly regarding the particular words and phrases that are more likely to be associated with files that contain child pornography.

to his laptop to view its contents. In its written decision, the court stated: "The contents of the Shared-D directory as they existed on the Gateway computer [that had been] copied to an external drive [were] introduced as evidence. During his testimony before the court . . . Aresco navigated to the Overnet folder, which contained six files and three subfolders. . . . Within the Intermediate subfolder . . . Aresco played selected clips from 207.part, 230.part and 311.part. . . . Each video was played using Windows Media Player.[13] . . .The five clips played corresponded to the time stamps indicated in the state's [operative] information: File '207.part' from 00:00 to 00:31 shows a female child performing oral sex on an adult male's penis; [f]ile '207.part' from 13:48 to 15:00 shows a close view of a female child's genitalia as she masturbates; [f]ile '207.part' from 32:57 to 33:33 shows an adult male engaging in anal sex with a female child; [f]ile '230.part' from 37:00 to 40:10 shows a naked female child masturbating; [f]ile '311.part' from 02:55 to 04:29 shows a female child removing her underwear and simulating oral sex with use of artificial male genitalia." (Citations omitted; footnote added.)

In connection with the files containing these video clips, the court admitted into evidence state's exhibits 40

---

[13] At trial, defense counsel objected to the playing of the contents of the Shared D folder, a copy of which had been made and moved to an external drive, on the ground that there was "no evidence that [the defendant's] computer had the ability to play what's on the external drive." Defense counsel asserted that, "without playing it through [the defendant's] computer, [counsel didn't] see how the state could play it, using, perhaps, a different media player [from what the defendant] was able to use." When the court asked defense counsel to explain further, counsel mentioned Rizza's testimony that there was no evidence that the files on the defendant's computer had been viewed and argued that the state needed "to prove that [the defendant] was able to play it, [that the defendant] was able to view it." According to defense counsel, this was necessary to show that the defendant knowingly possessed the child pornography. The court disagreed that the state, to establish possession, had to show that the defendant had an ability to play the files. The court also noted that the fact that the Gateway computer did not have a media player did not necessarily mean that the defendant could not play the video clips. It, therefore, overruled defense counsel's objection.

through 50, which include screenshots and information related to the content of the downloaded clips taken from files 207.part, 230.part and 311.part. Aresco testified that exhibit 40 shows "the active transfers through the eMule program" that had originated prior to May 16, 2016,[14] and that the files were being transferred to the hard drive located in the defendant's Gateway computer. The name of one of the files that was in the process of being transferred is, in part, "Pthc – Vicky 2 . . . ." Aresco was able to see the details of that downloaded file, which were included in exhibit 42. Aresco testified that exhibit 43 shows active downloads that were taking place on the defendant's computer using the eMule program, which included a file with the name "(pthc pedo) Young Video Models - D04 - Daphne 9yo (nude) (Youngvideomodels Yvm) . . . ." State's exhibit 46, which shows more of the files that were being actively downloaded, contains a file named "[pthc] ~Under A Violet Moon~ (32m28s, HD) - 11yo 12yo 13yo 14yo . . . ."[15] State's exhibits 51, 52 and 53, which the court admitted into evidence, show the frame rates respectively for 207.part, 230.part and 311.part. The frame rate for file 207.part is 30 frames per second, for file 230.part it is 25 frames per second, and for file 311.part it is 59.94 frames per second.

State's exhibit 54, which the court admitted into evidence, is a Lenovo laptop computer (laptop) that had been seized from the second floor of the defendant's residence. During Aresco's examination of the laptop, he discovered a link file, which he described "as a shortcut Windows file. The Windows file creates a shortcut file any time a user accesses a file. A shortcut file [is] just a link to the actual file that was opened. The shortcut file

[14] The process of downloading file 311.part began in January, 2016, and for files 207.part and 230.part, it began in February, 2014.

[15] The full file names that correspond with files 207.part, 230.part and 311.part, respectively, are "Pthc - Vicky 2 - Babyj Anal Upgrade Moskow Schoolgirl 3 Raygold Russian 7Yo Preteen Vicky (41.30Mins) New.avi"; "(pthc pedo) Young Video Models – D04 – Daphne 9yo (nude) (Youngvideomodels Yvm) (----,----, ------, ---------).avi"; and "[pthc] ~Under A Violet Moon~ (32m28s, HD) – 11yo 12yo 13yo 14yo opva creampie cumshot 2014 pedo preteen anal kids lolita ptsc_cut.avi."

doesn't contain any of the contents of the original file; it just contains pointers of where that original file was found." When asked whether any of the link files on the laptop "indicate[d] that there had been a connection to the Overnet folder on [the defendant's Gateway computer]," Aresco responded, "yes." In particular, state's exhibit 57, which the court admitted into evidence, shows details about one of the shortcut files on the laptop and where the original file resided, namely, the folder named Overnet on a networked computer. The username on the laptop is "Richard." State's exhibit 59, which is a document that was found in the drop box folder of the laptop and has a file name of "RichardDoreFile.doc," appears to be a biography that the defendant attached to a resume. It states in relevant part that the defendant "is a seasoned developer with extensive experience in software architecture and developing software solutions across different platforms . . . using different languages . . . ." The document further describes in detail the defendant's knowledge of and experience with different computer languages, as well as certain software he had designed.

The state also presented testimony from Sundes Kazmir, an attending physician at Yale New Haven Hospital, who is a board-certified child abuse pediatrician and a board-certified general pediatrician. As the court found, she "testified about her review of each of these five clips. . . . Kazmir testified, based upon her knowledge and experience, that each of the five clips depicted a real child under the age of sixteen." She made that determination on the basis of her assessment of "external indicators of physical maturation" that would be "signs of puberty," the onset of which she testified as occurring between the ages of eight and thirteen. She described the children in the video clips as being "prepubertal," meaning that there were no "signs indicative of later sexual maturation," which was "suggestive of younger children." She further testified that she had "never examined a sixteen or older patient who did not have signs of puberty." On cross-examination, she acknowledged that she was not a computer expert and did not know anything about the

creation of the video files or if they had been altered in any way. On redirect, she was asked whether the female children depicted in the video clips appeared to be real, to which she responded, "[y]es." She also was asked whether "there were any indications that anything mismatched what [she] would expect to see in an actual child's body," to which she responded that there were no such indications.

After the prosecutor rested the state's case, defense counsel moved for a judgment of acquittal on all counts. First, defense counsel argued that the state did not establish that the defendant knowingly possessed child pornography because there was "no evidence at all that [the defendant] had accessed or played any of [the] files," and, if the defendant "hadn't accessed them, then he certainly didn't knowingly possess them." Further, defense counsel argued, relying on *Ashcroft* v. *Free Speech Coalition*, 535 U.S. 234, 244, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002), that "virtual child pornography is constitutionally protected," and, for that reason, "courts have required states to prove that these are actual identifiable[16] children . . . . There's been no evidence or testimony here that any of the visual depictions presented by the state involve an identified victim." **(Footnote added.)** As a result, defense counsel argued that the state did not establish a prima facie case.

In response, the prosecutor argued that the elements of child pornography in the second degree "do not require the state to prove that the defendant accessed or viewed

---

[16] Throughout the trial proceedings and in his appellate briefs, the defendant repeatedly has made the argument that the images at issue must depict actual, *identifiable* children. We must clarify that, although General Statutes (Rev. to 2015) § 53a-193 (13) defines child pornography to include images or videos that "involve the use of a person" under the age of sixteen, nothing in the statute requires the person depicted in the image or video to be "identifiable." Therefore, to the extent the defendant claims that the child must be identifiable, he is incorrect. Our analysis, therefore, focuses of the aspect of his claim concerning whether the video clips at issue involve real children, rather than virtual images.

We also note that references in this opinion to § 53a-193 (13) are to the 2015 revision of that subdivision, unless otherwise indicated.

the possessed child pornography in any way." The prosecutor pointed to the evidence showing that the Gateway computer that was seized from the residence of the defendant, who acknowledged to Aresco that he had been downloading child pornography, was in the process of downloading child pornography at the time of its seizure. The prosecutor also noted the testimony from Kazmir indicating her opinion that the video clips depicted real children and that there was "ample evidence to show that [the defendant] was aware that these files of child pornography existed on his computer."

Following a brief recess, the court denied defense counsel's motion for a judgment of acquittal, finding "that the evidence presented by the state could reasonably permit a finding of guilty beyond a reasonable doubt . . . ." Specifically, the court stated: "The testimony and evidence established that [the Gateway] computer . . . contained two hard drives . . . and that one of those hard drives was believed, based on an examination at the [state] forensic laboratory in Meriden, to contain possible child pornography. . . . [C]ontained on that hard drive were a number of files, which include the five files [that] are charged in counts one through five of the [operative] information . . . . The evidence included exhibits consisting of copies of videos, which were found to be on the hard drive [and] which are the videos described in counts one through five of the [operative] information. And, having viewed the videos, as well as heard the testimony of the witnesses, it appears to me that a finder of fact could reasonably find that the defendant, on . . . May 16 . . . of 2016, was in possession of the child pornography . . . [as] described . . . in counts one through five of the [operative] information.

"The exhibits themselves, upon the court's viewing of them, clearly depict what appear to be young, real females engaged in sexually explicit activity, specifically, masturbation, intercourse, and/or lascivious exhibition of genitals . . . which would fall within a definition of pornography.

"The testimony of . . . Kazmir, which the court finds persuasive, in fact the court credits the testimony of all the state's witnesses, and the testimony of . . . Kazmir to the effect that her examination of the same materials that the court viewed, indicate to her that the females depicted in the videos show no indications of breast development or genital development, which would suggest prepuberty individuals, which would suggest, according to the testimony of . . . Kazmir, that they're under fourteen years of age." The court also stated that, "other than having proof that the defendant actually viewed these materials himself, the evidence still . . . is such that it would reasonably permit a finding of guilt beyond a reasonable doubt on the element of knowingness. The evidence indicated that the computers were configured at the time of the search warrant, in what appears to me, anyway, to be a relatively sophisticated way. That is to say, the idea that these computers could have become configured as they are could have been an accident on [the defendant's] part seems to me to be preposterous. And, it appears that, when the search warrant was executed . . . the Gateway computer was . . . running what has been described as the eDonkey and eMule program, which is described as a source known to law enforcement through which individuals obtain or share child pornography, among other things.

"The volume of material that was involved in current downloads, just based on my review of the screenshots from the day the search warrant was executed, indicates that there was substantial ongoing downloading activity of files with titles which suggest that their content would be, or could be, child pornography. . . . [O]nce again, that this could have been an accident, or that [the defendant] would have arranged this without knowing what he was doing, seems highly unlikely to the court. . . . [I]n addition, and importantly, the defendant . . . did make statements at the time the search warrant was executed, in which the defendant admitted that he had been involved, engaged in downloading child pornography for an extended period. . . . [H]e admitted to law

enforcement at the time of the execution of the search warrant that the materials were pornographic in nature and involved children.

"The testimony of . . . Kazmir establishes in the mind of the court that the individuals depicted in the—that are charged in counts one through five were in fact under the age of sixteen, likely under the age of fourteen. And, having viewed the evidence . . . the court is clear that the materials actually do constitute child pornography and that this could reasonably be found based on the evidence." The court also indicated that it "did look at the *Ashcroft* case" and stated that, "having reviewed the exhibits themselves that are described in counts one through five, in light of also the testimony of . . . Kazmir, I don't detect any reason—any suggestion that the videos depict what the *Ashcroft* court would have called . . . virtual pornography. I make a finding that it's real."

Thereafter, the defense presented testimony from William Jacob Green, an expert witness in computer forensics. Green testified that there was no evidence demonstrating "that [the defendant] had accessed the part files within the Intermediate folder of Overnet," and that he "observed no evidence to support the use or the opening of any of the part files" by the defendant. On cross-examination, the prosecutor asked Green at what point the data from downloading a file starts to be written on the destination computer, and Green replied, "[f]rom the very first piece of the partial file . . . ." The prosecutor then stated, "[s]o, whatever portion of the file has been downloaded is written onto the destination computer, is that correct," to which Green responded, "[c]orrect." At the conclusion of Green's testimony, the defense rested, and defense counsel renewed his motion for a judgment of acquittal for the reasons previously articulated, which the court denied.

The parties filed posttrial briefs in September, 2023. In his posttrial brief, the defendant raised three arguments. First, he argued that § 53a-196e (a) (2) is unconstitutionally overbroad and vague in that it "extends

beyond child pornography involving an actual child." Second, the defendant asserted that the state had failed to prove that the images in the part files "were of actual, identifiable children under the age of sixteen, as distinct from virtual computer images." In his third argument, the defendant asserted that the state had failed to prove that he had actual knowledge of the contents of the part files. The state contended in its posttrial brief that the evidence presented was sufficient to establish each of the elements of the crime of possession of child pornography in the second degree beyond a reasonable doubt.

On September 14, 2023, the court heard closing arguments after which it announced its finding, which was subsequently memorialized in a written decision dated September 21, 2023. Specifically, the court found, on the basis of the testimony presented and the exhibits, including its viewing of the five video clips that the defendant is alleged to have possessed and which the state alleged contained child pornography, that "the state [had] proven beyond a reasonable doubt all of the elements necessary to constitute the crime of possession of child pornography [in the second degree] as charged. Accordingly, [the court] found the defendant guilty of possession of child pornography in counts one [through] five." The defendant was sentenced on all counts to a total effective term of six years of incarceration, execution suspended after two years, which are mandatory, followed by ten years of probation. This appeal followed. On February 16, 2024, the defendant filed a motion for articulation of the trial court's decision, and, on June 12, 2024, the court issued an articulation.[17] Additional facts and procedural history will be set forth as necessary.

I

The defendant claims that § 53a-196e (a) (2) violates the first amendment to the United States constitution

---

[17] The court's articulation will be discussed further in part II A of this opinion.

because it is **(1)** overbroad and **(2)** vague. We address these claims in turn.

As an initial matter, we note that "[t]he constitutionality of a statute presents a question of law over which our review is plenary." (Internal quotation marks omitted.) *State* v. *Book*, 155 Conn. App. 560, 564, 109 A.3d 1027, cert. denied, 318 Conn. 901, 122 A.3d 632 (2015), cert. denied, 578 U.S. 977, 136 S. Ct. 2029, 195 L. Ed. 2d 219 (2016). Moreover, " '[l]egislative enactments carry with them a strong presumption of constitutionality. . . . A party challenging the constitutionality of a validly enacted statute bears the heavy burden of proving the statute unconstitutional beyond a reasonable doubt. . . . In the absence of weighty countervailing circumstances, it is improvident for the court to invalidate a statute on its face.' . . . *State* v. *Bennett-Gibson*, 84 Conn. App. 48, 56, 851 A.2d 1214, cert. denied, 271 Conn. 916, 859 A.2d 570 (2004); see also *State* v. *Billings*, 217 Conn. App. 1, 26, 287 A.3d 146 (2022), cert. denied, 346 Conn. 907, 288 A.3d 217 (2023). This burden is especially heavy in the context of a facial challenge. See *State* v. *Ryan*, 48 Conn. App. 148, 154, 709 A.2d 21, cert. denied, 244 Conn. 930, 711 A.2d 729, cert. denied, 525 U.S. 876, 119 S. Ct. 179, 142 L. Ed. 2d 146 (1998). Additionally, we indulge every presumption in favor of the constitutionality of the statute and approach a claim of unconstitutionality 'with caution, examine it with care, and sustain the [statute] unless its invalidity is clear.' . . .

"Our Supreme Court previously has stated: '[I]n evaluating the defendant's challenge to the constitutionality of the statute, we read the statute narrowly in order to save its constitutionality, rather than broadly in order to destroy it. . . . In so doing, we take into account any prior interpretations that this court, our Appellate Court and the Appellate Session of the Superior Court have placed on the statute.[18] . . . [W]e may also add interpretive gloss to a challenged statute in order to render it

---

[18]We note that we have not found any case law from Connecticut courts interpreting subdivision (2) of § 53a-196e (a).

constitutional. In construing a statute, the court must search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent.' . . . *State* v. *Indrisano*, 228 Conn. 795, 805–806, 640 A.2d 986 (1994)." (Citation omitted; footnote added.) *State* v. *Russo*, 221 Conn. App. 729, 757–58, 303 A.3d 279 (2023), cert. denied, 348 Conn. 938, 307 A.3d 273 (2024).

A

The defendant's claim that § 53a-196e (a) (2) is unconstitutionally overbroad is premised on his assertion that the language of subdivision (2) of § 53a-196e (a) does not restrict its breadth or scope to real children. We are not persuaded by this claim.

"[W]e set forth a general description of the overbreadth doctrine. 'The essence of an overbreadth challenge is that a statute that proscribes certain conduct, even though it may have some permissible applications, sweeps within its proscription conduct protected by the first amendment. . . . Overbroad statutes, like vague ones, inhibit the exercise of constitutionally protected conduct. . . . A party has standing to raise an overbreadth claim, however, only if there [is] a realistic danger that the statute will significantly compromise recognized [f]irst [a]mendment protections of parties not before the [c]ourt . . . . In *Broadrick* v. *Oklahoma*, 413 U.S. 601, 615, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973), the Supreme Court stated that where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be *real*, but *substantial* as well, judged in relation to the statute's plainly legitimate sweep.' . . . *State* v. *Snyder*, 49 Conn. App. 617, 623–24, 717 A.2d 240 (1998); see also *Virginia* v. *Hicks*, 539 U.S. 113, 118–19, 123 S. Ct. 2191, 156 L. Ed. 2d 148 (2003). Finally, we note that in *Broadrick* v. *Oklahoma*, supra, 613, the United States Supreme Court stated that '[a]pplication of *the overbreadth doctrine . . . is, manifestly, strong medicine. It has been employed by the* [c]*ourt sparingly and only as a last resort.* Facial overbreadth has not been invoked

when a limiting construction has been or could be placed on the challenged statute.' . . . Id.; see also *United States* v. *Hansen*, 599 U.S. 762, 770, 143 S. Ct. 1932, 216 L. Ed. 2d 692 (2023) ('[b]ecause it destroys some good along with the bad, [i]nvalidation for overbreadth is strong medicine that is not to be casually employed' . . .).

"Our Supreme Court has explained the rationale underlying the overbreadth doctrine. 'A clear and precise enactment may . . . be overbroad if in its reach it prohibits constitutionally protected conduct. . . . A single impermissible application of a statute, however, will not be sufficient to invalidate the statute on its face; rather, to be invalid, a statute must reach a substantial amount of constitutionally protected conduct. . . . A [defendant] may challenge a statute as facially overbroad under the first amendment, even if the [defendant's] conduct falls within the permissible scope of the statute, to vindicate two substantial interests: (1) eliminating the statute's chilling effect on others who fear to engage in the expression that the statute unconstitutionally prohibits; and (2) acknowledging that every [person] has the right not to be prosecuted for expression under a constitutionally overbroad statute. . . . Thus, the [defendant] has standing to raise a facial overbreadth challenge to the [statute] and may prevail on that claim if he can establish that the [statute] reaches a substantial amount of constitutionally protected conduct even though he personally did not engage in such conduct.' . . . *State* v. *Cook*, 287 Conn. 237, 244–45, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008)." (Emphasis in original; footnote omitted.) *State* v. *Russo*, supra, 221 Conn. App. 758–59.

"The first amendment, applicable to the states through the fourteenth amendment, provides that 'Congress shall make no law . . . abridging the freedom of speech . . . .' U.S. Const., amend. I. '[A]s a general matter, the [f]irst [a]mendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.' . . . The state may violate

this mandate in various ways, 'but a law imposing criminal penalties on protected speech is a stark example of speech suppression.' *Ashcroft* v. *Free Speech Coalition*, [supra, 535 U.S. 244]." (Citation omitted.) *State* v. *Billings*, supra, 217 Conn. App. 24–25.

"As a general principle, the [f]irst [a]mendment bars the government from dictating what we see or read or speak or hear. The freedom of speech has its limits; it does not embrace certain categories of speech, including defamation, incitement, obscenity, and pornography produced with real children." *Ashcroft* v. *Free Speech Coalition*, supra, 535 U.S. 245–46. In *Ashcroft*, the United States Supreme Court "consider[ed] . . . whether the Child Pornography Prevention Act of 1996 (CPPA), 18 U.S.C. § 2251 et seq., abridges the freedom of speech." Id., 239. As the court explained: "The CPPA extends the federal prohibition against child pornography to sexually explicit images that appear to depict minors but were produced without using any real children. The statute prohibits, in specific circumstances, possessing or distributing these images, which may be created by using adults who look like minors or by using computer imaging. The new technology, according to Congress, makes it possible to create realistic images of children who do not exist. See Congressional Findings, notes following 18 U.S.C. § 2251." *Ashcroft* v. *Free Speech Coalition*, supra, 239–40. As a result, the court concluded that the CPPA was unconstitutionally overbroad because it "prohibit[ed] child pornography that does not depict an actual child" or virtual child pornography. Id., 240.

Following *Ashcroft*, in 2004, the legislature amended the definition of child pornography in the General Statutes. Specifically, pursuant to Public Acts 2004, No. 04-139, § 2 (P.A. 04-139), the definition of child pornography in General Statutes (Rev. to 2015) § 53a-193 (13)[19] was amended to mean "any visual depiction including

_____

[19] We note that § 53a-193 (13) was further amended in 2024 to replace the term "child pornography" with "child sexual abuse material." See Public Acts 2024, No. 24-118, § 2; see also footnote 1 of this opinion.

any photograph, film, videotape, picture or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where the production of such visual depiction involves the *use of a person* under sixteen years of age engaging in sexually explicit conduct, provided whether the subject of a visual depiction was a person under sixteen years of age at the time the visual depiction was created is a question to be decided by the trier of fact."[20] **(Emphasis added.)** This was done so that our laws concerning child pornography comport with *Ashcroft*.[21]

With this background in mind, we next set forth the language of the statute that is being challenged by the

[20] On March 1, 2004, Commissioner of Public Safety Arthur L. Spada submitted written testimony in support of the proposed amendments in P.A. 04-139, stating in part: "The United States Supreme Court held in *Ashcroft* v. *Free Speech Coalition* [supra, 535 U.S. 234] two years ago that 'virtual' pictures could not be considered child pornography. 'Virtual' refers to pictures that are completely rendered by computer. Virtual images do not use children and do not involve the actual sexual abuse of a child. Since the decision in *Ashcroft*, law enforcement and the courts in Connecticut have been reluctant to fully enforce our state child pornography law. The proposed legislation makes it clear that Connecticut's definition of child pornography does not include 'virtual' images." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 2004 Sess., p. 1419.

[21] See 47 H.R. Proc., Pt. 13, 2004 Sess., pp. 4009, 4012, remarks of Representative John E. Stone, Jr. (stating, during House of Representatives proceedings concerning P.A. 04-139, that proposed amendment expanded current law pertaining to possession and importation of child pornography from applying only to live performance to include "computer generated types of pornography," and clarifying that amendment made current law "consistent with recent Supreme Court rulings"); 47 S. Proc., Pt. 7, 2004 Sess., pp. 1909–10, remarks of Senator Andrew J. McDonald ("Madam President, the amendment now before the Chamber would . . . create separate levels of crimes for the possession of child pornography. And before I get into the different levels, Madam President, I do want to state for the record that the definition of 'child pornography' has been very painstakingly crafted in this legislation to address certain constitutional challenges that have been raised in other jurisdictions. I do want to specifically mention that the definition of 'child pornography' would require a visual depiction, including any type of photograph, film or videotape, of a child who is an actual person under the age of [sixteen] years. And, I should note for the record that that would preclude the graphic composition of a child in an electronic

defendant as unconstitutionally overbroad. General Statutes (Rev. to 2015) § 53a-196e (a) provides: "A person is guilty of possessing child pornography in the second degree when such person knowingly possesses (1) twenty or more but fewer than fifty visual depictions of child pornography, or (2) a series of images in electronic, digital or other format, which is intended to be displayed continuously, consisting of twenty or more frames, or a film or videotape, consisting of twenty or more frames, that depicts a single act of sexually explicit conduct by one child." Under the statute, subdivision (1) concerns still images of child pornography, whereas subdivision (2) concerns moving images, whether in electronic, digital or other format, such as film or videotape. In 2014, the legislature amended § 53a-196e to add subdivision (2); see Public Acts 2014, No. 14-192, § 2 (P.A. 14-192); under which the defendant in the present case was charged and convicted. The 2014 amendment was designed to "update the [statute] to reflect the current technology through which child pornography is produced and distributed" and to address how images in a child pornography case are counted. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 6, 2014 Sess., p. 2523, written testimony submitted by the Division of Criminal Justice; see also Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 2014 Sess., p. 2289, testimony of Attorney Michael A. Gailor of the Division of Criminal Justice (stating that purpose of amendment is to address "computer-generated images and other types of things that are equivalent of videotapes").

mode within the definition of a 'person.' It would actually have to be a live, breathing individual under the age of [sixteen] years. I wanted to make that clear."); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 2004 Sess., p. 1269, remarks of Chief State's Attorney Christopher L. Morano (House Bill No. 5043 was designed to address issues of "constitutional concern" with the law); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 2004 Sess., p. 1304, remarks of Major Timothy Palmbach, Department of Public Safety, Division of Scientific Services (consistent with *Ashcroft* decision, language of amendment reflects removal of "all the components of virtual images from our child pornography statute").

The defendant's claim that § 53a-196e (a) (2) is unconstitutionally overbroad can be distilled to the following: because subdivision (2) of § 53a-196e (a) does not include in its description of the illegal materials the defined term "child pornography," which, as amended to comply with *Ashcroft*, specifically pertains to "the *use of a person* under sixteen years of age engaging in sexually explicit conduct"; (emphasis added) General Statutes (Rev. to 2015) § 53a-193 (13); it runs afoul of *Ashcroft* in that it does not limit its coverage to digital images of actual children, as opposed to virtual images. According to the defendant, subdivision (1) of § 53a-196e (a) "utilizes the defined term 'child pornography,' thereby restricting its scope to depictions of actual, identifiable children; however, [subdivision (2) of § 53a-196e (a)] not only fails to use that defined term, but it utilizes language which is nearly identical to that which the legislature deleted in 2004 when it amended the relevant definition to comply with *Ashcroft*. . . . Nothing in [subdivision] (2) evidences legislative intent to restrict [its scope] to depictions of actual, identifiable children. Rather than employing the defined term, [subdivision] (2) criminalizes knowing possession of 'a series of images in electronic, digital or other format . . . that depicts a single act of sexually explicit conduct by one child.' The statute does not say 'one *actual* child' or 'one *real* child.' More importantly, unlike the definition of child pornography in § 53a-193 (13), it does *not* require that 'the production of such visual depiction involves the use of a person. . . .' As the *Ashcroft* court observed in 2002: 'The new technology, according to Congress, makes it possible to create realistic images of children who do not exist.' *Ashcroft* [v. *Free Speech Coalition*, supra, 535 U.S. 240]. If the technology existing in 2002 made possible the creation of 'realistic images of children who do not exist,' it stands to reason that technological developments in recent years have enabled the creation of much more realistic images."[22] (Citation omitted; emphasis in original.) The

---

[22] In its written decision, the court rejected this claim, stating: "[T]he court is satisfied that the statute charged in this case facially prohibits the possession of images of real, although perhaps not personally identifiable, children. Defense counsel argues that, because the [subdivision] charged refers to 'one child' and not to suggested clarifying language such as 'one *actual* child' or 'one *real* child' . . . the [subdivision] embraces

defendant further asserts that "[t]he legislative history of P.A. 14-192 makes no reference whatsoever to *Ashcroft* or any constitutional requirements. Instead, as noted, that legislation adopted language nearly identical to that which had already been deemed noncompliant. . . . [N]othing in the 2014 legislative history provides even a scintilla of support for an interpretive gloss allowing for a conclusion that subsection (a)(2) contains the same restriction, i.e., involvement of a real, identifiable child, as . . . (a)(1)." We are not persuaded.

We first look to the language of § 53a-196e (a) (2). Although subdivision (2), by itself, does not use the term "child pornography," it refers to "sexually explicit conduct by one *child*." (Emphasis added.) Because the word "child" is not defined in the statutes governing child pornography, we "look to the dictionary to ascertain its commonly approved meaning." *State* v. *Marsala*, 337 Conn. 55, 74, 252 A.3d 349 (2020). The word "child" is defined as "a young *person*, [especially] between infancy and youth . . . ." (Emphasis added.) Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 214; see also Black's Law Dictionary (6th Ed. 1990) p. 239 ("[a]t common law one who had not attained the age of fourteen years"). A "person" is defined as "human, individual . . . ." Merriam-Webster's Collegiate Dictionary, supra, p. 1184. As we already have noted, "child pornography" under General Statutes (Rev. to 2015) § 53a-193 (13) "involves the *use of a person* under sixteen years of age . . . ." (Emphasis added.) Hence, the word "child" in subdivision (2) is consistent with the requirement under § 53a-193 (13) that the pornography must involve a person, as opposed to virtual images. That determination is further reinforced when subdivision (2) is construed in conjunction with subdivision (1) and the legislative

images created without the involvement of real children. . . . The court does not read the [subdivision] that way. The plain language of the prohibition is to 'sexually explicit conduct by one child,' and there is nothing in the [subdivision] to suggest that the legislature meant by that one fictitious child or one nonexistent child." (Citation omitted; emphasis in original.)

purpose underlying the statutory revision that added subdivision (2).

It is well settled that we cannot read subdivision (2) of § 53a-196e (a) in a vacuum. See, e.g., *Thomas* v. *Dept. of Developmental Services*, 297 Conn. 391, 408, 999 A.3d 682 (2010) (statutory "provision [cannot] be interpreted in a vacuum, without reference to the statute's other provisions"); see also *State* v. *Cobb*, 251 Conn. 285, 387, 743 A.2d 1 (1999) ("This court does not interpret statutes in a vacuum, nor does it refuse to consider matters of known historical fact. . . . And although criminal statutes are strictly construed, it is equally fundamental that the rule of strict construction does not require an interpretation which frustrates an evident legislative intent." (Internal quotation marks omitted.)), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). When we read § 53a-196e (a) as a whole, as we must, we find no merit to the contention that subdivision (2) is not limited to child pornography involving a real child. First, subsection (a) of the statute specifically provides in relevant part that "[a] person is guilty of possessing *child pornography* in the second degree when such person knowingly possesses . . . (2) a series of images in electronic, digital or other format, which is intended to be displayed continuously, consisting of twenty or more frames, or a film or videotape, consisting of twenty or more frames, that depicts a single act of sexually explicit conduct by one child." (Emphasis added.) General Statutes (Rev. to 2015) § 53a-196e (a) (2). Although there is no specific reference to the term "child pornography" within subdivision (2), that subdivision must be read in conjunction with the preceding language in subsection (a) designating the crime covered by the statute, which references "child pornography." The definition of that term is clearly limited to images of an actual child and excludes from its ambit virtual child pornography. See General Statutes (Rev. to 2015) § 53a-193 (13).

Second, subdivision (2) also must be read in conjunction with subdivision (1), which expressly proscribes the

possession of still images of child pornography.[23] Subdivision (2) was added to the statute in 2014 to address advancing technology concerning moving images, whether in electronic, digital or other format, such as film or videotape; there is nothing in the record, nor have we discovered anything in our research, indicating that the 2014 amendment had any bearing on the change in the law to limit application of the child pornography statutes to real children, rather than virtual images of children. It follows, therefore, that a harmonious reading of both subdivisions of the statutes leads to the conclusion that they are both aimed at the possession of actual, not virtual, child pornography.[24]

[23] Notably, the Connecticut Criminal Jury Instructions pertaining to § 53a-196e and what is now referred to as "child sexual abuse material," which has since been substituted in General Statutes §§ 53a-193 (13) and 53a-196e (a) (2) in lieu of the term "child pornography"; see footnotes 1 and 19 of this opinion; make no distinction between the two subdivisions of § 53a-196e (a). Specifically, instruction 7.7-4 provides in relevant part: "The first element is that the defendant possessed child sexual abuse material. 'Child sexual abuse material' is any visual depiction, including any photograph, film, videotape, picture or computer-generated image or picture, whether made or produced by electronic, digital, mechanical or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a person under [sixteen] years of age engaging in sexually explicit conduct, provided whether the subject of a visual depiction was a person under [sixteen] years of age at the time the visual depiction was created is a question to be decided by the trier of fact. A 'computer-generated image' is an image of a real child under the age of [sixteen] that has been digitally captured, stored, altered, and/or enhanced. . . ." Connecticut Criminal Jury Instructions 7.7-4 (revised to March 26, 2025), available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited February 5, 2026). This provides further support for our conclusion that both subdivisions of the statute apply only to images of real children.

[24] We find unavailing the defendant's claim that, because the two subdivisions are separated by the disjunctive "or," we should look to the language of subdivision (2) only. Specifically, he contends that "the use of the word 'or' . . . is enormously significant because it means that a person could be convicted of only one of these two [subdivisions]." He cites *500 North Avenue, LLC* v. *Planning Commission*, 199 Conn. App. 115, 132, 235 A.3d 526, cert. denied, 335 Conn. 959, 239 A.3d 320 (2020), for the proposition that " 'the use of the disjunctive "or" between the two parts of the statute indicates a clear legislative intent of separability.' " We agree that, because the statute uses the disjunctive

We are mindful that "[t]he law prefers rational and prudent statutory construction, and we seek to avoid interpretations of statutes that produce odd or illogical outcomes. *State* v. *George J.*, 280 Conn. 551, 574–75, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007). [I]t is axiomatic that those who promulgate statutes . . . do not intend to promulgate statutes . . . that lead to absurd consequences or bizarre results. . . . Consequently, [i]n construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended . . . ." (Internal quotation marks omitted.) *McHenry Solar, LLC* v. *Hampton*, 235 Conn. App. 355, 375, 345 A.3d 916 (2025); see also *State* v. *Drupals*, 306 Conn. 149, 165, 49 A.3d 962 (2012). Moreover, "the legislature, in amending or enacting statutes, always [is] presumed to have created a harmonious and consistent body of law . . . ." (Internal quotation marks omitted.) *State* v. *Ragalis*, 235 Conn. App. 538, 569, 345 A.3d 844, cert. denied, 353 Conn. 934, 347 A.3d 877 (2025); see also *State* v. *Webber*, 225 Conn. App. 16, 30, 315 A.3d 320 (courts consider statute "as a whole with a view toward reconciling its parts in order to obtain a sensible and rational overall interpretation" (internal quotation marks omitted)), cert. denied, 349 Conn. 915, 315 A.3d 301 (2024).

"[I]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of

"or," only one of the two subdivisions must be shown to establish a violation of the statute. See *Avon* v. *Sastre*, 224 Conn. App. 155, 168, 312 A.3d 40, cert. denied, 349 Conn. 905, 312 A.3d 1058 (2024). Nevertheless, in our examination of the constitutionality of the statute and our "search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent"; (internal quotation marks omitted) *State* v. *Russo*, supra, 221 Conn. App. 758; we must look "to the broader statutory scheme to ensure the coherency of our construction"; (internal quotation marks omitted) *State* v. *Webber*, 225 Conn. App. 16, 30, 315 A.3d 320, cert. denied, 349 Conn. 915, 315 A.3d 301 (2024); especially in light of the presumption that the legislature has "created a harmonious and consistent body of law . . . ." (Internal quotation marks omitted.) *State* v. *Ragalis*, 235 Conn. App. 538, 569, 345 A.3d 844, cert. denied, 353 Conn. 934, 347 A.3d 877 (2025).

our construction. . . . [T]he General Assembly is always presumed to know all the existing statutes and the effect that its action or [nonaction] will have upon any one of them. . . . Legislation never is written on a clean slate, nor is it ever read in isolation or applied in a vacuum. Every new act takes its place as a component of an extensive and elaborate system of written laws. . . . Construing statutes by reference to others advances [the values of harmony and consistency within the law]. In fact, courts have been said to be under a duty to construe statutes harmoniously where that can reasonably be done." (Citation omitted; internal quotation marks omitted.) *State* v. *Webber*, supra, 225 Conn. App. 30–31.

The defendant's construction of § 53a-196e (a) (2) ignores these well settled tenets of statutory construction. The defendant contends that "[t]he choice by the legislature to use the defined term in (a) (1) [of § 53a-196e] and a different, broader term in (a) (2) reflects a clear intent that the two disjunctive [subdivisions] would differ in scope, with only the former being limited to images of real, identifiable children." We disagree. It would be illogical to conclude that, in 2004, the legislature amended the definition of child pornography in § 53a-193 (13) to limit the statutes governing child pornography, consistent with *Ashcroft*, to images of real children, but, in amending § 53a-196e in 2014 to add subdivision (2), intentionally expanded the scope of subdivision (2) to go beyond real children and include virtual depictions of children, even though it was aware of the limits imposed by *Ashcroft*. We cannot conclude that the legislature intended to enact an unconstitutional law. See *Whitfield* v. *Empire Mutual Ins. Co.*, 167 Conn. 499, 508, 356 A.2d 139 (1975) ("[i]t is to be presumed that legislatures do not deliberately enact ineffective and unconstitutional laws" (internal quotation marks omitted)); *Amsel* v. *Brooks*, 141 Conn. 288, 295, 106 A.2d 152 (same), appeal dismissed, 348 U.S. 880, 75 S. Ct. 125, 99 L. Ed. 693 (1954). Indeed, we agree with the state that "[c]onstruing § 53a-196e (a) (2) to proscribe possessing virtual child pornography would render it

effectively futile because such a construction would place the law in constitutional jeopardy under [*Ashcroft*], the very result the legislature was aware of and sought to avoid in 2004 when it limited the definition of 'child pornography' to actual child pornography."

Indulging every reasonable presumption in favor of the constitutionality of the statute, we conclude that the images covered by § 53a-196e (a) (2) must be of a real child and that § 53a-196e (a) (2) does not allow for a prosecution thereunder to be based on virtual images of children. This construction results in a harmonious, consistent body of law that aligns with the broader statutory scheme designed to protect against the exploitation and sexual abuse of children. The defendant, therefore, has not met his heavy burden of demonstrating that § 53a-196e (a) (2) is unconstitutionally overbroad on its face.

Moreover, an "overbreadth claimant bears the burden of demonstrating, from the text of [the law] and from *actual fact*, that substantial overbreadth exists. . . . *Virginia* v. *Hicks*, [supra, 539 U.S. 122]; see also *United States* v. *Hansen*, [supra, 599 U.S. 784] (to succeed on claim, defendant must show that overbreadth is substantial relative to statute's plainly legitimate sweep); *State* v. *Culmo*, 43 Conn. Supp. 46, 73, 642 A.2d 90 (1993) ([t]he task of demonstrating that a statute will significantly compromise recognized first amendment rights of parties not before the court, thus triggering facial overbreadth analysis, is on the defendant)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Russo*, supra, 221 Conn. App. 763.

We are guided by this court's decision in *State* v. *Russo*, supra, 221 Conn. App. 729, on this issue and conclude that the defendant has failed to meet his burden of showing "substantial overbreadth from the text of the law or from actual fact. See *Regan* v. *Time, Inc.*, 468 U.S. 641, 650, 104 S. Ct. 3262, 82 L. Ed. 2d 487 (1984) ('an overbreadth challenge can be raised on behalf of others only when the statute is substantially overbroad, i.e.,

when the statute is unconstitutional in a substantial portion of cases to which it applies'). It was the defendant's burden to demonstrate a 'realistic danger that the statute itself will significantly compromise recognized [f]irst [a]mendment protections of parties not before the [c]ourt . . . .' *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, [466 U.S. 789, 801, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984)]." *State* v. *Russo*, supra, 766. In the present case, the defendant made no factual showing demonstrating the prosecution of individuals under the statute based on virtual child pornography. Consequently, as in *Russo*, "the present case is not one in which the '"strong medicine"' of the overbreadth doctrine should be employed." Id.

Accordingly, we reject the defendant's claim that § 53a-196e (a) (2) is unconstitutionally overbroad.

B

The defendant also claims that § 53a-196e (a) (2) is unconstitutionally vague, both on its face and as applied to him. In particular, he asserts that § 53a-196e (a) (2) is "vague on its face because it fails to utilize either the defined term which would restrict its prohibitions to depictions involving actual, identifiable children or any other language that would accomplish the same goal. Moreover . . . § 53a-196e (a) (2) is vague as applied because the state failed to present evidence proving beyond a reasonable doubt that the images in the subject files . . . were images of actual, identifiable children rather than being the work of a tech-savvy content creator." We disagree with both aspects of the defendant's vagueness challenge to the statute.

Our Supreme Court recently addressed a vagueness challenge to a statute and set forth the following legal principles: "The determination of whether a statutory provision is unconstitutionally vague is a question of law over which we exercise de novo review." *State* v. *Winot*, 294 Conn. 753, 758–59, 988 A.2d 188 (2010). In undertaking such review, we are mindful that [a] statute is not

void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . Id., 759.

"To prevent arbitrary and discriminatory enforcement, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [police officers], judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. . . . *Grayned* v. *Rockford*, 408 U.S. 104, 108–109, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). [A] legislature [must] establish minimal guidelines to govern law enforcement. . . . [When] the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep [that] allows [police officers], prosecutors, and juries to pursue their personal predilections. . . . *Kolender* v. *Lawson*, 461 U.S. 352, 358, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983)." (Internal quotation marks omitted.) *State* v. *Enrrique H.*, 353 Conn. 823, 835–36, 347 A.3d 1156 (2025).

"A statute . . . [that] forbids or requires conduct in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. . . . Laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly. . . . A statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to [him], the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be

void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties." (Internal quotation marks omitted.) *State* v. *Ares*, 345 Conn. 290, 303–304, 284 A.3d 967 (2022).

The defendant's facial vagueness challenge to § 53a-196e (a) (2) is based on the same claim raised in support of his overbreadth claim, namely, that because subdivision (2) "makes no reference to the statutorily defined term 'child pornography,' even though it is used in sub[division] (1), which, as previously discussed, is in the disjunctive and thus reflects a clear legislative intent of separability . . . an ordinary person would not understand [that subsection] (a) (2) [involves] the same depictions as the statutory definition . . . ." We rejected this very same claim in the context of the defendant's overbreadth challenge and determined that the statute does not implicate constitutionally protected speech. See part I A of this opinion; see also *State* v. *Ehlers*, 252 Conn. 579, 585, 750 A.2d 1079 (2000). For the same reasons already set forth in part I A of this opinion, the defendant's claim that the statute is vague on its face fails and we need not discuss it further.

With respect to the defendant's vagueness as applied claim, our Supreme Court has stated that "a court analyzing an as-applied vagueness challenge may determine that the statute generally provides sufficient guidance to eliminate the threat of arbitrary enforcement without analyzing more specifically whether the particular enforcement was guided by adequate standards. In fact, it is the better (and perhaps more logical) practice to determine first whether the statute provides such general guidance, given that the [United States] Supreme Court has indicated that the more important aspect of the vagueness doctrine is the requirement that a legislature establish minimal guidelines to govern law enforcement. . . . If a court determines that a statute provides sufficient guidelines to eliminate generally the risk of arbitrary enforcement, that finding concludes the inquiry."

(Internal quotation marks omitted.) *State* v. *Enrrique H.*, supra, 353 Conn. 836–37.

We conclude that § 53a-196e (a) (2) is not unconstitutionally vague as applied to the defendant because it "generally provides sufficient guidance to eliminate the threat of arbitrary enforcement, which concludes [our] inquiry." (Internal quotation marks omitted.) Id., 837. In other words, the statute provides sufficient notice that it proscribes the possession of child pornography, which, as defined, means "any visual depiction including any photograph, film, videotape, picture or computer-generated image or picture, whether made or produced by electronic, digital, mechanical or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a person under sixteen years of age engaging in sexually explicit conduct . . . ." General Statutes (Rev. to 2015) § 53a-193 (13). Section 53a-196e (a) (2) also provides sufficient guidance concerning what the state, in a prosecution for possession of child pornography in the second degree, must demonstrate. Specifically, in a prosecution under subsection (a) (2), the state must prove that the defendant knowingly possessed "a series of images in electronic, digital or other format, which is intended to be displayed continuously, consisting of twenty or more frames, or a film or videotape, consisting of twenty or more frames, that depicts a single act of sexually explicit conduct by one child." As discussed previously in this opinion and in light of the statutory definition of child pornography, the images at issue must be of a real child, as opposed to virtual images.

Furthermore, even if we were to conclude that the statute fails to provide sufficient guidance, "an as-applied vagueness challenge may nonetheless fail if the statute's meaning has a clear core. . . . In that case the inquiry will involve determining whether the conduct at issue falls so squarely in the core of what is prohibited by the law that there is no substantial concern about arbitrary enforcement because no reasonable enforcing officer

could doubt the law's application in the circumstances." (Internal quotation marks omitted.) *State* v. *Enrrique H.*, supra, 353 Conn. 837. In the present case, because "the defendant's conduct . . . clearly falls within the statute's 'unmistakable core meaning of prohibited conduct' . . . namely, the possession of pornographic material depicting persons under the age of sixteen years, he may not challenge the statute for vagueness on due process grounds." (Citation omitted.) *State* v. *Ehlers*, supra, 252 Conn. 588; see also *State* v. *Michael R.*, 346 Conn. 432, 462, 291 A.3d 567 ("[t]his is not a situation [in which] the state is holding an individual criminally responsible for conduct [that] he could not [have] reasonably underst[ood] to be proscribed" (internal quotation marks omitted)), cert. denied,    U.S.    , 144 S. Ct. 211, 217 L. Ed. 2d 89 (2023). As a result, the defendant's as-applied vagueness claim lacks merit.

## II

Next, we address the defendant's challenge to the sufficiency of the evidence to support his conviction of possession of child pornography in the second degree. Specifically, the defendant claims that the evidence was insufficient to establish that (1) the video clips depict real children and (2) he knowingly possessed child pornography.

Before addressing the merits of these claims, we set forth our well established standard of review and relevant legal principles. "The standard of review for a sufficiency of the evidence claim employs a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [fact finder] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the [fact finder] if there is sufficient evidence to support [its] verdict. . . .

"It is axiomatic that the [fact finder] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [fact finder] to conclude that a basic fact or an inferred fact is true, the [fact finder] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [fact finder's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Abdulaziz*, 231 Conn. App. 789, 829–30, 334 A.3d 1007, cert. denied, 353 Conn. 906, 343 A.3d 503 (2025); see also *State* v. *Inzitari*, 351 Conn. 86, 92, 329 A.3d 215, cert. denied, U.S. , 145 S. Ct. 2787, 222 L. Ed. 2d 1080 (2025).

"[P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts [that] establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citation omitted; internal quotation marks omitted.) *State* v. *Ragalis*, supra, 235 Conn. App.

547–48. With these principles in mind, we address the defendant's claims in turn.

A

The defendant claims that the evidence was insufficient to establish that the video clips depict real children. In support of this claim, the defendant asserts that, "[a]lthough the state introduced evidence from three computer experts who testified in detail about such issues as the chain of custody, none of the experts referred even tangentially to the question of whether the images were computer generated. Rather, the sole person who testified on this issue was . . . Kazmir. Not only was this issue far outside her expertise as a pediatrician, but her sworn testimony was clear [that she was not a computer expert and did not know about the creation of the images or whether they had been altered in any way]. . . . Both the trial court and the state took the position that expert testimony is not needed to ascertain whether images are of real, identifiable children as opposed to being virtual images, which are computer generated. Both cited decisions [from] 2006 for this position. As a result, both failed to account . . . for the dramatic changes in technology over the past twenty years, including, inter alia, the extent to which creators can generate images that are indistinguishable from real ones to the naked, untrained eye." (Citation omitted.) In addition to those arguments, the defendant also found it "troubling" that the court relied on its own viewing of the images and based its conclusion on its own observation and opinion. For the reasons that follow, we reject this claim.

The following additional facts and procedural history are relevant to this claim. After the defendant filed this appeal, he filed a motion for articulation seeking to have the trial court articulate whether it found that § 53a-196e (a) (2) "requires the state to prove beyond a reasonable doubt that the images at issue are of real persons rather than images generated by artificial intelligence or other technological means," and, if so, to set forth whether the state met that burden, including the evidence in

support thereof, as well as the factual and legal bases for its finding that the subject images were of real persons.

In its written articulation, the court answered the first question as follows: "The court found that . . . § 53a-196e (a) (2) requires the state to prove beyond a reasonable doubt that the images in question are of real persons. In finding that this is a required element of the offense charged, the court relied on the plain language of the statutory section at issue and the language of the applicable definitions in . . . § 53a-193, including, but not limited to, [subdivision] (13), 'child pornography.' The court notes that the definitions section does not include a definition of 'child' or 'person.' The court also relied on Connecticut [Criminal] Jury Instructions 7.7-4, which provides that it is the state's burden to prove that the allegation involved an 'actual, real person.'" The court also cited a number of cases for the proposition that juries or fact finders are able to distinguish between real and virtual images, and that expert testimony is not required.

The court, in its articulation, answered the second question by stating: "The court found that the state sustained its burden on the issue of whether the images in question were of real persons. In doing so, the court relied on the law cited in [its response to question one], as well as all of the evidence in the record, including, but not limited to, the court's review of the images at issue; see *State* v. *Sorabella*, [277 Conn. 155, 188, 891 A.2d 897 (overruled in part on other grounds by *State* v. *Douglas C.*, 345 Conn. 421, 285 A.3d 1067 (2022)), cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006); and the expert testimony of . . . Kazmir, a board-certified pediatrician, that, based on her knowledge and experience and her review of the five video clips on which the charges were based, [those video clips] depicted a real child under the age of sixteen. This testimony was not seriously challenged by the defense, and the court found it credible and persuasive. Again, the defendant produced no evidence regarding the generation of any images, much less those before the court, by artificial intelligence or other

technological means. The court also found persuasive on this issue evidence concerning the file names under which the images in issue were downloaded by the defendant, the testimony of law enforcement witnesses regarding their experience with the online sources from which the defendant obtained the images, and the statement made by the defendant to law enforcement officers at the time of his arrest regarding the images at issue, his history of seeking and downloading such content, and his intention in doing so as to the images at issue." Finally, the court stated that its "conclusion that the images in the subject files were real persons [was] legally and factually based on the matters recited . . . in [answers one and two]."

We now turn to relevant law. General Statutes (Rev. to 2015) § 53a-196e (a) provides in relevant part: "A person is guilty of possessing child pornography in the second degree when such person knowingly possesses . . . (2) a series of images in electronic, digital or other format, which is intended to be displayed continuously, consisting of twenty or more frames, or a film or video-tape, consisting of twenty or more frames, that depicts a single act of sexually explicit conduct by one child." "Child pornography" is defined as "any visual depiction including any photograph, film, videotape, picture or computer-generated image or picture, whether made or produced by electronic, digital, mechanical or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a person under sixteen years of age engaging in sexually explicit conduct, *provided whether the subject of a visual depiction was a person under sixteen years of age at the time the visual depiction was created is a question to be decided by the trier of fact*." (Emphasis added.) General Statutes (Rev. to 2015) § 53a-193 (13).

Similar to the claim raised by the defendant in the present case, the defendant in *State* v. *Sorabella*, supra, 277 Conn. 187, who had been convicted of, inter alia, importing child pornography, claimed on appeal that "the state should have been required to adduce expert testimony to

prove that the images depicted a real person under sixteen years of age. In support of [that] claim, the defendant underscore[d] the fact that 'new technology . . . makes it possible to create realistic images of children who do not exist.' *Ashcroft* v. *Free Speech Coalition*, [supra, 535 U.S. 240]." In rejecting that claim, our Supreme Court stated: "We agree that, at least in some cases, it may be difficult for a lay observer to distinguish between real and virtual images. As the defendant acknowledges, however, the vast majority of courts have rejected the claim that, in light of technological advances, the prosecution, in every case, must present expert testimony to establish that a particular image depicts a real child. E.g., *United States* v. *Slanina*, 359 F.3d 356, 357 (5th Cir.), cert. denied, 543 U.S. 845, 125 S. Ct. 288, 160 L. Ed. 2d 73 (2004); *United States* v. *Kimler*, 335 F.3d 1132, 1142 (10th Cir.), cert. denied, 540 U.S. 1083, 124 S. Ct. 945, 157 L. Ed. 2d 759 (2003); *People* v. *Phillips*, 215 Ill. 2d 554, 571–75, 831 N.E.2d 574 (2005); see also *United States* v. *Deaton*, 328 F.3d 454, 455 (8th Cir. 2003); *United States* v. *Hall*, 312 F.3d 1250, 1260 (11th Cir. 2002), cert. denied, 538 U.S. 954, 123 S. Ct. 1646, 155 L. Ed. 2d 502 (2003). Indeed, he cites to no contrary authority. In the absence of any persuasive support for the view advocated by the defendant, we see no compelling reason to adopt a special rule of evidence for cases such as the present case, which involves images transmitted over the Internet. Although we cannot conclude, in light of evolving technology, that such a rule never will be necessary, we believe that '[j]uries are still capable of distinguishing between real and virtual images; and admissibility remains within the province of the sound discretion of the trial judge.' *United States* v. *Kimler*, supra, 1142; accord *United States* v. *Slanina*, supra, 357." (Footnote omitted.) *State* v. *Sorabella*, supra, 187–88.

It is also important to note that, although *Sorabella* was decided in 2006, the court applied the definition of child pornography in the 1999 revision of § 53a-193 (13), which provided that " '[c]hild pornography' means any

material involving a live performance or photographic or other visual reproduction of a live performance which depicts a minor in a prohibited sexual act." General Statutes (Rev. to 1999) § 53a-193 (13). When the statute was revised in 2004, the revision added the language that the issue of "whether the subject of a visual depiction was a person under sixteen years of age at the time the visual depiction was created is a question to be decided by the trier of fact"; P.A. 04-139, § 2; which did not apply under the facts of *Sorabella*. The present case, however, is governed by that statutory language.

We also find informative and persuasive to our discussion of this issue the recent decision of the United States Court of Appeals for the Eighth Circuit in *United States* v. *Schram*, 128 F.4th 922, 925 (8th Cir.), cert. denied,   U.S.   , 146 S. Ct. 172,   L. Ed. 2d   (2025), on which the state relies in its appellate brief. In *Schram*, the defendant was indicted by a grand jury in 2020 and charged with and convicted of four counts of advertising child pornography and one count of engaging in a child exploitation enterprise, and, at trial, "the government presented evidence that he administered four sites where he and other users shared links to what appeared to be child pornography." Id., 924–25. On appeal, the defendant in *Schram* argued that the evidence was insufficient to support his conviction because it failed to establish "that he advertised depictions of real children engaged in sexually explicit conduct." Id., 925. The court concluded that the evidence was sufficient to support the defendant's conviction "because the jury saw excerpts from pornographic content [the defendant] advertised on his websites, all of which featured children. It could, therefore, inspect those excerpts and decide for itself that the children were real. We have said as much before, and so have our sister circuits. [*United States* v.] *Koch*, 625 F.3d [470, 479 (8th Cir. 2010)]; see, e.g., *United States* v. *Pawlak*, 935 F.3d 337, 350 (5th Cir. 2019) [cert. denied, 589 U.S. 1221, 140 S. Ct. 1214, 206 L. Ed. 2d 214 (2020)]; *United States* v. *Sims*, 428 F.3d 945, 957 (10th Cir. 2005); cf. also *United States* v. *Vig*, 167 F.3d

443, 449 (8th Cir.) [cert. denied, 528 U.S. 859, 120 S. Ct. 146, 145 L. Ed. 2d 125 (1999), and cert. denied, 528 U.S. 859, 120 S. Ct. 314, 145 L. Ed. 2d 125 (1999)].

"With improvements in image-generation technology, we may someday have to revisit our precedent, cf. *Ashcroft* v. *Free Speech Coalition*, [supra, 535 U.S. 259] (Thomas, J., concurring in the judgment), but [the defendant] has not convinced us that today is that day. We will suppose, for present purposes, that we could disregard our court's prior decisions if changes in technology undermined their assumption that jurors can reliably distinguish images of real children from images of virtual children. But see *United States* v. *Rodriguez-Pacheco*, 475 F.3d 434, 442 (1st Cir. 2007). The trouble for [the defendant] is that the record here, far from undermining that assumption, is entirely consistent with it.

"Until this appeal, that was obvious because the record was devoid of evidence about the distinguishability of real and virtual children. And it is only slightly less obvious now, after [the defendant] pointed us to a handful of webpages about computer image generation. Those webpages, which we assume we can consider, are less than illuminating. They reveal, at most, that computer programs could generate images of virtual people at the time of [the defendant's] offense and that their realistic output was becoming ever more realistic. Few could dispute that, but it is beside the point. What matters is how accurate jurors are in distinguishing realistic images of virtual children from images of real children. See id., 443 n.8. And on that question, the webpages are silent.

"Without more, we are not prepared to depart from our court's precedent allowing juries to decide whether images depict real children based on the images themselves. At the foundation of that precedent is the principle that the government need not produce evidence to negate a speculative assertion that a child in an image is virtual. [*United States* v.] *Vig*, [supra, 167 F.3d 450]. That principle is as true today as it was when we announced it—three years after Congress found that one

could make images of virtual children almost 'indistinguishable to the unsuspecting viewer' from images of actual children. Child Pornography Prevention Act, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009–26 (1996). And it requires us to reject [the defendant's] challenge to the sufficiency of the evidence. On the nearly empty record here, [the defendant's] concern that images shown to the jury depicted virtual children is just speculation unsupported by any concrete facts." *United States* v. *Schram*, supra, 128 F.4th 925–26; see also *United States* v. *Irving*, 452 F.3d 110, 120–21 (2d Cir. 2006) (rejecting claim that *Ashcroft* increased government's evidentiary burden by requiring specific type of proof to show use of actual child or, in absence of direct evidence of identity, expert testimony to prove that images are of real and not virtual children).

The defendant in the present case appears to be urging this court to take the position that the circumstances of this case and advances in technology warrant a departure from *Sorabella* and require testimony from an expert in computers to prove that an image involves a real child.[25] The problem with this argument is threefold. First and foremost, the language of General Statutes (Rev. to 2015) § 53a-193 (13) expressly provides that "whether the

---

[25] In his primary appellate brief, the defendant criticizes the state and the trial court for relying on *Sorabella* and *United States* v. *Irving*, supra, 452 F.3d 110—both cases decided in 2006—arguing that, by doing so, the court and the state "both failed to account . . . for the dramatic changes in technology over the past twenty years, including, inter alia, the extent to which creators can generate images that are indistinguishable from real ones to the naked, untrained eye." He argues further that, "during the eighteen . . . years since *Irving* was decided, it is undisputed that technology has changed dramatically, as references to AI [artificial intelligence], CGI [computer generated imagery], morphing, and deepfakes have become part of the lexicon and lay people have struggled to discern the differences between virtual and real images. See, e.g., [S.] Thompson, 'A.I. Can Now Create Lifelike Videos. Can You Tell What's Real?' New York Times, September 9, 2024." In his discussion of morphing, a type of image editing process, the defendant also cites to W. Wilder, "Virtual Vice: The Urgent Need to Reassess *Ashcroft* v. *Free Speech Coalition* in the Age of AI-Generated Child Pornography," 48 Law & Psych. Rev. 169, 173–74 (2023–2024).

subject of a visual depiction was a person under sixteen years of age at the time the visual depiction was created is a question to be decided by the trier of fact." There is no requirement of expert testimony in the statute. Thus, in the present case, it was proper for the court, as the trier of fact, to make a finding that the video clips depicted real children on the basis of its viewing of the video clips and the evidence presented, including its credibility assessment of Kazmir's testimony. To the extent the defendant suggests impropriety with the court making that finding on the basis of its "personal opinion" after viewing the video clips, any such claim lacks merit.

Second, "[i]t is axiomatic that, [a]s an intermediate appellate court, we are bound by Supreme Court precedent and are unable to modify it. . . . [W]e are not at liberty to overrule or discard the decisions of our Supreme Court but are bound by them. . . . [I]t is not within our province to reevaluate or replace those decisions." (Internal quotation marks omitted.) *State* v. *Yury G.*, 207 Conn. App. 686, 693–94 n.2, 262 A.3d 981, cert. denied, 340 Conn. 909, 264 A.3d 95 (2021). Thus, we decline the defendant's invitation to establish a new rule requiring the state, in a prosecution under § 53a-196e (a) (2), to adduce expert testimony to prove that the images depict a real person under sixteen years of age.[26]

Third, the record in the present case, similar to *Schram*, does not undermine the assumption that a trier of fact is capable of making this determination, as it is devoid of any evidence concerning the technology existing in 2016 or the ability of a trier of fact in 2016 to distinguish realistic images of virtual children from images of real children. As the court noted in its articulation, "the defendant produced no evidence regarding the generation of any images, much less those before the court, by artificial intelligence or other technological means." At trial, the defendant never offered any

---

[26] Notably, the defendant has not directed this court to any authority, in Connecticut or elsewhere, requiring expert testimony to establish that a particular image depicts a real child.

documentary or testimonial evidence to establish in the record his contention that then existing technology was such that a layperson would not be able to discern whether the images depicted real or virtual children.[27] See *United States* v. *Schram*, supra, 128 F.4th 926 ("[o]n the nearly empty record here, [the defendant's] concern that images shown to the jury depicted virtual children is just speculation unsupported by any concrete facts"); *United States* v. *Pawlak*, supra, 935 F.3d 350 (defendant failed to point to any evidence establishing that images at issue "were anything other than what the government contended they were: child pornography involving actual prepubescent children," and, even "though it was 'the [g]overnment's burden to show that actual children were depicted,' here . . . 'the images themselves sufficed to authenticate them in this regard'"). Instead, in his appellate brief, he makes bald assertions about technology and types of image editing and relies on newspaper and law review articles that were not raised before or presented to the court, which we, thus, decline to consider. See, e.g., *State* v. *Owens*, 235 Conn. App. 482, 498 n.14, 345

---

[27] Contrary to the defendant's suggestion, requiring him to provide a record in support of his assertion that technology has advanced such that an expert is needed to discern whether images depict real or virtual children does not improperly shift the burden of proof in the case. The law is clear, as the trial court stated in its articulation, that § 53a-196e (a) (2) requires the state to prove beyond a reasonable doubt that the images in question are of real persons, and the court held the state to that burden in this case. The law in Connecticut is equally clear that such a determination may be made by a fact finder, without the need for expert testimony. See General Statutes (Rev. to 2015) § 53a-193 (13); *State* v. *Sorabella*, supra, 277 Conn. 187–88. Nevertheless, in *Sorabella*, in concluding that a jury or trier of fact is "still capable of distinguishing between real and virtual images," our Supreme Court recognized that, "in light of evolving technology," that rule may need to change. *State* v. *Sorabella*, supra, 188. It necessarily follows that a defendant claiming that the time has come for a change in that rule needs to present evidence in support of such a claim demonstrating the existing technology and why it precludes a layperson from being able to detect real images from virtual ones. Otherwise, any such claim is based on speculation, and there would be no basis in the record from which a court could reach a conclusion that expert testimony is necessary. See *United States* v. *Schram*, supra, 128 F.4th 925.

A.3d 489 (2025) (declining to consider evidence that was not before trial court).

Accordingly, having concluded that the state was not required to present expert testimony to prove that the video files depict actual children, we now examine whether the evidence presented by the state was sufficient to establish beyond a reasonable doubt that the video files—207.part, 230.part and 311.part—found on the defendant's computer depict real children. In support of this burden, the state presented copies of five separate video clips taken from the files retrieved from the defendant's computer, each of which corresponded to a count of the operative information. The video clips were admitted into evidence during the trial and viewed by the court. The state presented testimony from Christensen regarding the chain of custody of the evidence seized from the defendant's residence. The state also presented testimony from Kazmir, a board-certified pediatrician, about her review of each of the five video clips, which the court specifically found credible. The court found that "Kazmir testified, based upon her knowledge and experience, that each of the five clips depicted a real child under the age of sixteen."

Kazmir made that determination on the basis of her assessment of "external indicators of physical maturation" that would be "signs of puberty," the onset of which she testified as occurring between the ages of eight and thirteen. She described the children in the video clips as being "prepubertal," meaning that there were no "signs indicative of later sexual maturation" and which was "suggestive of younger children." She further testified that she had "never examined a sixteen or older patient who did not have signs of puberty." Even though she acknowledged on cross-examination that she was not a computer expert and did not know anything about the creation of the images or if they had been altered in any way, on redirect she was asked whether the female chil-

dren depicted in the video clips appeared to be real, to which she responded, "[y]es." She also was asked whether "there were any indications that anything mismatched what [she] would expect to see in an actual child's body," to which she responded that there were no such indications. Again, the court relied on her testimony, as well as its own viewing of the video clips, in finding that the state met its burden of proving beyond a reasonable doubt that the video clips involved real children. As stated in its articulation, the court also "found persuasive on this issue evidence concerning the file names under which the images in issue were downloaded by the defendant, the testimony of law enforcement witnesses regarding their experience with the online sources from which the defendant obtained the images, and the statement made by the defendant to law enforcement officers at the time of his arrest regarding the images at issue, his history of seeking and downloading such content, and his intention in doing so as to the images at issue."

Construing the evidence and the inferences reasonably drawn therefrom in the light most favorable to sustaining the verdict, we conclude that the court, as the fact finder, reasonably could have found that the video clips depict real children. The court made that finding on the basis of the testimony from Kazmir, which it specifically credited; see *State* v. *Wright*, 235 Conn. App. 143, 153, 345 A.3d 504 (appellate courts "must defer to the trier of fact's assessment of the credibility of the witnesses" (internal quotation marks omitted)), cert. denied, 353 Conn. 935, 347 A.3d 877 (2025); and on the basis of its own viewing of the video clips. See General Statutes (Rev. to 2015) § 53a-193 (13); *State* v. *Sorabella*, supra, 277 Conn. 187–88; see also *United States* v. *Schram*, supra, 128 F.4th 925; *United States* v. *Pawlak*, supra, 935 F.3d 350; *United States* v. *Irving*, supra, 452 F.3d 120–21.

Accordingly, the defendant's challenge to the sufficiency of the evidence on this ground fails.

## B

Next, the defendant claims that the evidence was insufficient to establish that he knowingly possessed child pornography. In support of this claim, he relies on the testimony of Rizza and Green that the Gateway computer did not have a media player capable of playing the video files, as well as Green's testimony that there was no evidence that the defendant did or could open the video files on the Gateway computer. According to the defendant, "if a person performed a search using search terms associated with child pornography, while they might be attempting to download such files, there is no way to know until they see the images or videos whether they have, in fact, succeeded. The only way for a person to know with any certainty whether they possess child pornography is if they open the file and view the content—and the evidence is undisputed that *this did not happen*." (Emphasis in original.) The defendant concedes that "the state presented evidence that the subject files were located on [the defendant's] computer's hard drive" and argues, instead, that the state "presented no evidence whatsoever which, if credited, would prove beyond a reasonable doubt that he possessed actual knowledge that these files were illegal child pornography." (Emphasis omitted.) We disagree and conclude that the defendant misapprehends the "knowingly possesses" element of § 53a-196e (a) (2).

For the defendant to be found guilty of possession of child pornography in the second degree under § 53a-196e (a) (2), the court had to find that "the defendant knowingly possessed the contraband"; *State* v. *Spence*, 165 Conn. App. 110, 123, 138 A.3d 1048, cert. denied, 321 Conn. 927, 138 A.3d 287 (2016); namely, that he knowingly possessed "a series of images in electronic, digital or other format, which is intended to be displayed continuously, consisting of twenty or more frames, or a film or videotape, consisting of twenty or more frames, that depicts a single act of sexually explicit conduct by

one child." General Statutes (Rev. to 2015) § 53a-196e (a) (2).[28]

"Possess, as defined in [General Statutes] § 53a-3 (2), means to have physical possession or otherwise to exercise dominion or control over tangible property. . . . Our jurisprudence elucidating this definition teaches that such possession may be actual or constructive. . . . Nevertheless, [b]oth actual and constructive possession require a person to exercise dominion and control over the [contraband] and to have knowledge of its presence and character. . . . Actual possession requires the defendant to have had direct physical contact with the [contraband]. . . . Typically, the state will proceed under a theory of constructive possession when the [contraband is] not found on the defendant's person at the time of arrest, but the accused still exercises dominion and control. . . . In this regard, [t]he essence of exercising control is not the manifestation of an act of control but instead it is the act of being in a position of control coupled with the requisite mental intent. In our criminal statutes involving possession, this control must be exercised intentionally and with knowledge of the character of the controlled object. . . . *State* v. *Spence*, [supra, 165 Conn. App. 123]." (Footnote omitted; internal quotation

---

[28] The defendant does not contest the sexually explicit nature of the images on the files—207.part, 230.part and 311.part—found on the hard drive of his Gateway computer, nor does he raise any claim concerning the frame rate of the video clips. The five video clips that were admitted into evidence, which form the basis for the five charges against the defendant, show a female child performing oral sex on an adult male's penis (file 207.part from 00:00 to 00:31), a close view of a female child's genitalia as she masturbates (file 207.part from 13:48 to 15:00), an adult male engaging in anal sex with a female child (file 207.part from 32:57 to 33:33), a naked female child masturbating (230.part from 37:00 to 40:10), and a female child removing her underwear and simulating oral sex with the use of artificial male genitalia (311.part from 02:55 to 04:29), all of which fall within the definition of "[s]exually explicit conduct" under General Statutes § 53a-193 (14). The state also presented evidence demonstrating the frame rates for each of the video clips, specifically, the frame rate for file 207.part is 30 frames per second, for file 230.part it is 25 frames per second, and for file 311.part it is 59.94 frames per second.

marks omitted.) *State* v. *Kenneth G.*, 237 Conn. App. 93, 103–104,    A.3d   (2026), petition for cert. filed (Conn. January 7, 2026 (No. 250272). General Statutes § 53a-3 (12) provides: "A person acts 'knowingly' with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists . . . ."

As we stated, the defendant appears to have conceded the possession element of the charges in that he acknowledges that "the state presented evidence that the subject files were located on [the defendant's] computer's hard drive . . . ." As a result, our discussion of this element is brief. In the present case, the police discovered child pornography on a password protected Gateway computer in the defendant's home, in which the defendant and his wife were the sole occupants, and the defendant provided the police with the password to that computer. Rizza testified that the files with the names 207.part, 230.part and 311.part were contained within the Gateway computer. He identified the files as movie files and explained the location where the files could be found within the computer. Rizza testified further that the defendant's name, Richard, was listed as a user of the Gateway computer. We conclude that the record contains sufficient evidence from which the court reasonably could have concluded that the defendant was the only person with access to the password protected Gateway computer that contained the child pornography and, thus, that he had control of the Gateway computer and possession of its contents. See *State* v. *Spence*, supra, 165 Conn. App. 124–25 (inference of possession of contraband can be made when "the contraband is contained within another object, [such as a] computer, that itself could be controlled and secured through the use of a password" and when "there are other pieces of evidence tying the defendant to dominion and control," and, because defendant was only person with control and access to password protected computer that contained child pornography, jury reasonably could have drawn "a rational conclusion that if the defendant had

control of the computer, then he had possession of its contents" (internal quotation marks omitted)).

The crux of the defendant's claim on appeal concerns whether the state established beyond a reasonable doubt that the defendant's possession of the child pornography was knowing. As we have stated, he asserts that, to demonstrate that he knowingly possessed the video files containing child pornography that were found on the Gateway computer, the state was required to prove that he had actual knowledge of the child pornography and that he was able to and did play, open and view those video files on the Gateway computer. We do not agree.

At the outset, we reject the defendant's contention that § 53a-196e (a) (2) requires "actual knowledge." In support of this contention, the defendant argues that the term "knowingly" in the statute is a specific intent term, which thereby requires the state to prove his actual knowledge of the contents of the file beyond a reasonable doubt. We disagree. The plain language of § 53a-196e (a) (2) does not require actual knowledge, and the defendant has not directed this court to any authority supporting this contention, nor have we found any. In fact, case law involving the crime of possession of child pornography shows that knowledge can be inferred. See *State* v. *Inzitari*, supra, 351 Conn. 119 ("deleted files associated with the defendant's personal email address . . . are indicative that the defendant had knowingly possessed child pornography"); *State* v. *Kenneth G.*, supra, 237 Conn. App. 109 ("[T]he jury could have *inferred* that the images were not downloaded inadvertently or by mistake and *that the defendant was aware of their existence* on the basis of the evidence that the defendant was familiar with nude and sexually suggestive photos of children and how to search for and store such material on his devices. See *United States* v. *Huyck*, [849 F.3d 432, 443 (8th Cir. 2017) ('evidence detailing [the defendant's] knowledge of, and interest in, child pornography [was] probative as circumstantial evidence regarding [the defendant's] knowing possession of the [hard drive containing thumbnails of

child pornography]'. . . ." (Emphasis added.)); *State* v. *Kirby*, 156 Conn. App. 607, 615, 113 A.3d 138 (2015) ("the jury reasonably could have *inferred* that the defendant copied the photographs onto his computer when he transferred the information from the victim's old cell phone to the new one, and *that he knew* that they were on his computer because he rotated them and altered the victim's face in one photograph" (emphasis added)). Moreover, the defendant's argument conflates intent with knowledge. See *State* v. *Denby*, 235 Conn. 477, 482, 668 A.2d 662 (1995) ("[a]n 'intent' element is not synonymous with a 'knowledge' element, each of which is specifically defined in the [P]enal [C]ode"); see also General Statutes § 53a-3 (12) ("[a] person acts 'knowingly' with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists"). If the legislature had intended to require actual knowledge under § 53a-196e (a) (2), "it knew how to effectuate that intent." *State* v. *Barnes*, 227 Conn. App. 760, 767, 323 A.3d 1166, cert. denied, 350 Conn. 922, 325 A.3d 1093 (2024); see also *State* v. *Avoletta*, 212 Conn. App. 309, 331, 275 A.3d 716 (2022) (" '[i]t is a well settled principle of statutory construction that the legislature knows how to convey its intent expressly . . . or to use broader or limiting terms when it chooses to do so' "), aff'd, 347 Conn. 629, 298 A.3d 1211 (2023).

In addressing the defendant's knowledge in its written decision, the trial court stated in relevant part that "the defendant's ability to play or view the images is not part of the state's burden. . . . [U]nder the relevant statutes, child pornography may take the form of 'any visual depiction.' General Statutes [Rev. to 2015] § 53a-193 (13). A '"[v]isual depiction" includes undeveloped film and videotape and data . . . that is capable of conversion into a visual image and includes encrypted data.' General Statutes [Rev. to 2015] § 53a-193 (15) . . . . 'Visual depiction' is not limited by the statute to the enumerated examples. The court rejects the notion that the legislature contemplated undeveloped film and encrypted files as

sufficient to satisfy the state's burden, but not files that readily play in Windows Media Player." **(**Emphasis omitted.**)** We agree with the court's analysis in this regard. The fact that a visual depiction may include undeveloped film undermines the defendant's argument that the state was required to show that he had viewed the video files at issue on his Gateway computer.

In the present case, viewing the evidence in the light most favorable to sustaining the trial court's guilty finding, we conclude that the court's determination that the defendant knowingly possessed the partially downloaded video files on his Gateway computer that contained child pornography was based on sufficient direct and circumstantial evidence in the record and the reasonable inferences drawn therefrom, which included Aresco's testimony about the defendant's inculpatory statements, the evidence seized from the defendant's residence and the Gateway computer, the evidence showing the defendant's sophistication with computers and familiarity with the eMule program and search terms associated with child pornography, and the evidence concerning the investigation by Aresco that led to the seizure of the defendant's computers.

Significantly, Aresco testified[29] regarding inculpatory statements made to him by the defendant at the time of the search of the defendant's residence, namely, that the defendant told Aresco that he had downloaded pornography involving individuals under the age of sixteen. The defendant also admitted to Aresco that he used the eMule file sharing program, which the defendant had installed on the Gateway computer, for the purpose of downloading movies, software, software manuals, and "illegal pornography." They also discussed search terms. In particular, Aresco explained to the defendant that he had "the ability to forensically see the search terms that [the defendant] entered to find files," and when Aresco was about to describe the search term preteen, before

---

[29] As we have mentioned, the court credited the testimony of all the state's witnesses.

he could do so "the defendant used that term himself." Thus, the record shows that, not only did the defendant admit to downloading "illegal" child pornography involving individuals under the age of sixteen, but also that he acknowledged using search terms commonly associated with child pornography.

The defendant's statements were corroborated by the evidence seized from his residence and the Gateway computer, which, at the time of the search, was in the process of downloading a number of files of child pornography, including files 207.part, 230.part and 311.part. Many of the downloads had visible file names that contained terms associated with child pornography. See footnote 15 of this opinion. For example, the state presented evidence showing the active transfers through the eMule program in the Gateway computer that corresponded to files 207.part, 230.part and 311.part, which had file names, respectively, of "Pthc - Vicky 2 - Babyj Anal Upgrade Moskow Schoolgirl 3 Raygold Russian 7Yo Preteen Vicky (41.30Mins) New.avi"; "(pthc pedo) Young Video Models – D04 – Daphne 9yo (nude) (Youngvideomodels Yvm) (----,----, ------, ---------).avi"; "[pthc] ~Under A Violet Moon~ (32m28s, HD) – 11yo 12yo 13yo 14yo opva creampie cumshot 2014 pedo preteen anal kids lolita ptsc_cut.avi." Through his forensic examination of the Gateway computer, Rizza determined that the three video files—207.part, 230.part and 311.part—each had been written to the hard drive of the Gateway computer and that a user would have access to those files. The active downloads that were taking place on the defendant's computer at the time of the search had been in that process for a lengthy period of time: the process of downloading file 311.part began in January, 2016, and for files 207.part and 230.part, it began in February, 2014.

The evidence also shows the defendant's sophistication with computers. As the court[30] found in its written

---

[30] We note that the trial court elaborated further regarding the defendant's sophistication with computers when it denied the defendant's oral motion for a judgment of acquittal at the end of the state's case-in-chief: "The evidence indicated that the computers were configured at the time

decision, "[a] document named 'RichardDoreBio.doc' was recovered from the defendant's . . . laptop computer, and it explained, in part, 'Richard Dore is a seasoned developer with extensive experience in software architecture and developing software solutions across different platforms . . . .'" The defendant had four computers in his home, and the Shared D folder on the Gateway computer was being shared with his other computers by way of a local network. Rizza explained that another computer connected to the local network would be able to access the Shared D drive of the Gateway computer. The court concluded in its written decision that "[i]t is reasonable for the court to infer, and the court does infer, that a sophisticated computer user like the defendant knew that partially downloaded child pornography files existed on his computer."

Finally, the defendant's knowledge of the contents of the partially downloaded video files on his Gateway computer can be inferred from the evidence concerning the investigation by Aresco that led to the seizure of the defendant's computers. Aresco had downloaded a partial video file that contained apparent child pornography; see footnote 5 of this opinion; from a user accessing a peer-to-peer network with the eMule program. The user reported the eMule user name "newone," which was specific to that user, and the IP address associated with the user who was sharing the file was traced to the

of the search warrant, in what appears to me, anyway, to be a relatively sophisticated way. That is to say, the idea that these computers could have become configured as they are could have been an accident on [the defendant's] part, seems to me to be preposterous. And, it appears that, when the search warrant was executed . . . the Gateway computer was . . . running what has been described as the eDonkey and eMule program, which is described as a source known to law enforcement through which individuals obtain or share child pornography, among other things.

"The volume of material that was involved in current downloads, just based on my review of the screenshots from the day the search warrant was executed, indicates that there was substantial ongoing downloading activity of files with titles which suggest that their content would be, or could be, child pornography. . . . [O]nce again, that this could have been an accident or that [the defendant] would have arranged this without knowing what he was doing, seems highly unlikely to the court."

Gateway computer belonging to the defendant. Rizza testified that the user name for the eMule program on the Gateway computer was "newone," and he located terms that had been entered into the eMule program's search feature on the Gateway computer, which included terms commonly associated with child pornography such as "'2015 pthc,' '12 yo,' and 'lolitasex.'" Although this does not directly establish the defendant's knowledge of the contents of the video files 207.part, 230.part and 311.part, it demonstrates the defendant's familiarity with the sharing of video files containing child pornography from his Gateway computer via the eMule program and the eDonkey network, which, along with the other evidence previously mentioned, lends further support for an inference that the defendant was aware that the video files that were partially downloaded using the eMule program and had file names commonly associated with child pornography contained child pornography.

As we have stated, "[a] person acts 'knowingly' with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists . . . ." General Statutes § 53a-3 (12). On the basis of the evidence presented and the inferences drawn therefrom, the court reasonably determined that the defendant was aware that the files 207.part, 230.part and 311.part that he had partially downloaded to the hard drive of his Gateway computer contained child pornography, even though he had not yet viewed the files. Accordingly, the evidence supports the court's determination that the state proved beyond a reasonable doubt that the defendant knowingly possessed child pornography.

The judgment is affirmed.

In this opinion the other judges concurred.